RICHARD L HOLCOMB (HI Bar No. 9177)
Holcomb Law, A Limited Liability Law Corporation
1136 Union Mall, Suite # 808
Honolulu, HI  96813
Telephone: (808) 545-4040
Facsimile: (808) 356-1954
Email: rholcomblaw@gmail.com

ALAN BECK (HI Bar No. 9145)
Attorney at Law
4780 Governor Drive
San Diego, California 92122
Telephone: (619) 971-0414
Email:  ngord2000@yahoo.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANDREW NAMIKI ROBERTS,<br><br>        Plaintiff,<br>    vs.<br><br>CITY AND COUNTY OF HONOLULU; and<br><br>JOHN DOES 1-50,<br><br>        Defendants. | CASE No. 1:15-CV-00467 ACK-RLP<br><br>REPLY TO RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS FEES [Doc. 21]; DECLARATION OF RICHARD L. HOLCOMB; DECLARATION OF ALAN BECK; EXHIBITS A THROUGH C; CERTIFICATE OF SERVICE |

**REPLY TO RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [Doc. 21]**

The lodestar should only be adjusted "in rare and exceptional circumstances." *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). The City has the burden to prove such rare and exceptional circumstances exist in this case. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008). The City has failed its burden. Each of the City's arguments is addressed below.

### A. Reply to City's Factual Background

The City apparently attempts to justify the violation of Mr. Roberts' constitutional rights. Specifically, the City (while acknowledging the plain language of *Fotoudis*, *infra*.) now argues that applying "no more or less scrutiny than would be applied to a citizen applicant … was challenging, especially given the fact that several permanent resident applicants lived for long periods of time in other countries and background checks did not necessarily reveal" some circumstances that might disqualify any person from ownership of firearms. [Doc. 21, p. 2] The City completely (and necessarily) ignores the fact that citizens who were born in the United States also live and travel abroad but were never required to seek any unspecified "clearance" from foreign countries before exercising their Second Amendment rights. *See Id.* This discrimination was the basis of Mr. Roberts' claims. [Doc. 1] And, the City has agreed through a judicially enforceable settlement agreement to resolve these claims by affording to Mr. Roberts <u>all of the relief</u> (with the exception of *nominal* damages) requested in his prayer for relief,

1

including non-enforcement of this offending policy.  [Doc. 11-1 ¶ 3.1]    Indeed, the City even agreed that Mr. Roberts is entitled to an attorneys' fees award.  [Doc. 11-1 ¶ 7 ("Releasor is entitled to an award of fees and costs …")]

Moreover, the City erroneously claims that once Mr. Roberts "was notified by telephone that his rifle/shotgun permit was being revoked given his failure to [submit to the discrimination by] provid[ing] such information," Mr. Roberts "immediately went out and purchased a shotgun and attempted to register it."  [Doc. 21, p. 2]    Mr. Roberts was not told that his rifle/shotgun permit which Mr. Roberts had previously lawfully obtained <u>without providing any "clearance"</u> was "revoked" (which constitutes conduct beyond any statutory authority vested with the HPD) until he sought to lawfully register the shotgun.  [Docs. 1 ¶ 56; 10 ¶ 32; 12-1, p. 3 ("At the police station, Mr. Roberts was informed that his permit to acquire rifles and shotguns was being 'revoked' …")]  Instead, Mr. Roberts was informed by telephone that his subsequent application for a handgun would not be approved unless and until Mr. Roberts submitted to the HPD's newly promulgated discriminatory policy, compliance with which (Mr. Roberts discovered) would require him to fly to Ashford UK to obtain records.  *Id*.

2

## B.  Argument

### The Complaint was properly filed.

The City argues that Mr. Roberts should not have filed the complaint in this case.[1]  This argument should be rejected for at least the following three reasons:

    1.    42 U.S.C. § 1983 provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144, n. 3 (1979); *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  The text of § 1983 specifically authorizes the filing of this lawsuit:  "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured **in an action at law**, suit in equity, or other proper proceeding for redress …" 42 U.S.C. § 1983 (emphasis added).  This is precisely the action Mr. Roberts lawfully and properly took in this case after the HPD blatantly violated his constitutional rights;

    2.    The primary issue and cause of Mr. Roberts' injury in this case was the HPD policy requiring permanent resident aliens to obtain unspecified "clearances"

---

[1] The City also recites the amounts awarded in *Hawaii Defense Foundation*, *et. al. v. City and County of Honolulu, et. al.*, Civ. No. CV12-00469 JMS RLP to suggest that Mr. Roberts' requested award is too high.  In that case, however, Plaintiffs requested a total of $64,690.29.  As noted in the City's Response, Plaintiffs were only awarded $31,610.56 after the hourly rates (in particular) were reduced to the rates the City requests that this Court award now, for work done more than four years later. [Doc. 21, p. 7]  Counsel has attached as Collective **Exhibit "A"** the Motion, Memorandum, Declarations and Timesheet of Attorneys Holcomb and Beck, and Objections that were filed in *Hawaii Defense Foundation*.  Mr. Roberts requests that this Court take judicial notice of these documents pursuant to Rule 201(c)(2) of the Federal Rules of Evidence.  Despite the time that elapsed in *Hawaii Defense Foundation* (which explained in the memorandum was, as in this case, largely due to the City's inaction), the amount of work completed (approximately a Complaint and two motions) and the hours requested are comparable to this case.  The hourly rates awarded then were too low.  Certainly, four years later, the hourly rates remain too low.

3

from their consulate.  Mr. Roberts has obtained a judicially enforceable settlement agreement prohibiting enforcement of this discriminatory policy, a remedy that could not have been achieved by merely calling Corporation Counsel.  Even if the City had agreed to all of the relief requested by Mr. Roberts before the filing of the lawsuit and voluntarily ceased its wrongful conduct, which is very easy for the City to now claim after-the-fact that it would have, the courts should nevertheless determine the legality of the conduct.  Otherwise, the City is free to simply return to its "old ways."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' … [I]f it did, the courts would be compelled to leave '[t]he defendant … free to return to his old ways.'" (citations omitted)).  The City's suggestion that, in order to recover attorneys' fees, Mr. Roberts must seek the City's approval before filing suit contradicts the express language of 42 U.S.C. § 1983, would cripple citizens' ability to affect meaningful policy changes via judicially enforceable settlement agreements, and would leave indigent victims of constitutional violations without representation despite the express policy behind 42 U.S.C. § 1988; and

       3.     The City properly acknowledges that the policy complained of here has been condemned by this Court only two years ago.  [Doc. 21, p. 2 (*citing Fotoudis v. City and County of Honolulu*, 54 F.Supp.3d 1136 (D.Haw. 2014)]  Nevertheless, <u>Mr. Roberts was specifically told by the HPD that this new and obviously unlawful policy originated from the Department of Corporation Counsel.</u>  [Docs. 1 ¶ 44; 10 ¶ 25]  It makes no sense that Mr. Roberts should assume the HPD official was lying and then seek approval from the Department of Corporation Counsel before filing the suit authorized by § 1983.

The relief obtained simply could not be achieved absent the filing of the Complaint

**<u>The hours expended were reasonable and should be compensated.</u>**

The City's suggestion that Mr. Roberts' counsel could have simply called the City and resolved this matter is disingenuous.  Except where Judge Seabright has intervened early in the case, as he did in *Fotoudis*, the City has recalcitrantly and

4

vigorously fought each of the undersigned's civil rights cases.[2] [*See* Docs. 21-4, 21-5]

**Moreover,** e**ven after the filing of this suit the City did not timely respond to counsel's numerous and genuine efforts to remedy this matter without accruing the fees of which the City now complains**:

- Despite the fact that he could have (and based on the City's delay and instant arguments should have) filed a Motion for Preliminary Injunction and/or a TRO contemporaneously with the complaint, Mr. Roberts instead did precisely what the City now suggests – counsel attempted to resolve this matter without accruing those fees which, but for the City's continued failure to respond to Mr. Roberts' various inquiries, *would have* proven unnecessary;

- Contemporaneously with service of the Complaint on November 9, 2015, Mr. Roberts delivered a demand letter to the City specifically informing the City that counsel would begin drafting a motion for preliminary injunction if Mr. Roberts received no communication from the City by November 13, 2015. [Docs. 12-1, p. 4; 12-10]  The letter also provided the City with *all* of the information that Mr. Roberts could produce in discovery and counsel's timesheet to assist the City in negotiating a timely settlement. [Doc. 12-6 ¶¶ 8-10] **Counsel received no response**;

- In an attempt to at least ascertain which Deputy Corporation Counsel would be assigned to the case, counsel personally contacted via text and e-mail Deputy Ernest Nomura and even e-mailed Curtis Sherwood on November 10, 2015. [Doc. 12-6 ¶ 12]  Both of these are attorneys that have represented the City in counsel's past cases and Mr. Sherwood is the City's attorney in this case.  **Despite even these efforts, the City failed to even inform counsel which Deputy was assigned to this case**;

---

[2] Judge Seabright also intervened early in *Hawaii Defense Foundation*.  *See* **Exh. "A"**.  Nevertheless, the City continued to bicker about the declaratory relief for two years.  Then, it refused to settle because it sought to attempt to cheat those Plaintiffs out of approximately $600 in costs.  *Id.*

5

- On November 18, 2015, counsel received the first communication from Mr. Sherwood. Although Mr. Sherwood requested another copy of the demand letter, Mr. Sherwood still did not confirm that he was the deputy assigned to the case. [Doc. 12-6 ¶ 13] Despite a direct inquiry as to whether he would be the City's attorney in this matter, **counsel received no further communication from the City**;

- On November 24, 2015, counsel sent another letter to the City. [Doc. 12-11] Finally, for the first time and in response to Mr. Roberts' providing notice that he would seek sanctions if the City continued to refuse to participate in a Rule 26(f) conference, Mr. Sherwood confirmed for the first time that he was, in fact the attorney assigned to the case.[3] [Doc. 21-2]

Following the November 25, 2015 letter, Mr. Roberts did participate in meaningful negotiations. However, the City insisted that it would only pay $5000 in fees and costs.[4] Yet by that time, counsel had incurred even more fees due to the

---

[3] Although the November 25 states that "nowhere in either of [counsel's] letters, ha[s] [counsel] given any reason why the discovery conference needs to take place so quickly," in the preceding sentence he acknowledged that counsel "suggested that the discovery conference will be 'extremely important in this matter as, at the very least, we could stipulate many (if not all) of the facts and, therefore, substantially simplify and shorten this litigation." *Id*. The instant constitutional violations were ongoing and Mr. Roberts deserved expedient relief. The City had been notified on numerous occasions that counsel sought to avoid fees where possible (such as those associated with the Motion for Preliminary Injunction), with no response from the City. Moreover, Rule 26(f) *requires* the parties to "confer as soon as practicable." Fed. R. Civ. P., Rule 26(f)(1).

[4] This was hardly a "tentative" settlement as the City argues. [*See* Doc. 21, p. 12] While the City stated that it would likely be willing to provide Mr. Roberts with his requested relief, the City would not agree to a reasonable settlement of fees. Despite Plaintiff's suggestion to do so, the parties did not agree to settle and leave the award of fees to the Court until after December 28, 2015. The $5000 offer is the maximum amount that Corporation Counsel can approve without City Council approval. This amount is extraordinarily low and, even based on a reduced hourly rate of $250,

City's failure to respond to Plaintiff's numerous inquiries summarized above. [Doc. 12-6 ¶¶ 17-20]  Once it became clear that the City would not budge from this unreasonable offer, counsel drafted a proposed settlement agreement permitting Corporation Counsel to seek approval from the City Council and only *if* the council denied the agreement (which based on counsel's understanding and experience would have been unlikely)  would Mr. Roberts apply  for fees with this Court.  [Doc. 12-6 ¶ 20]  This proposal was rejected without explanation.

Consistent with the remainder of the procedural history of this case and despite Mr. Roberts informing the City on December 18, 2015 that he would <u>file his Motions on December 28, 2016</u> if the City did not respond, [Doc. 12-12], (and despite counsel's several attempts to communicate with the City between December 18, 2015 and December 28, 2015, [Doc. 12-6 ¶ 22]) **counsel still received no response**.  **Instead, the City waited until 12:16 a.m. on December 28, 2015** to e-mail a letter insisting that $5000 was a reasonable resolution of attorneys' fees and insisting that Attorney Holcomb only receive $200 per hour.  [Doc, 12-15]  As the City should have known, by 12:16 a.m. on December 28, 2015, the motions were substantially completed.  [Docs. 12-13, 12-14]

---

counsel exceeded that amount in investigating and drafting the Complaint.  The City cannot unilaterally define this extraordinarily low amount as the going price for civil rights violations.

7

Frankly, counsel simply cannot fathom what additional measures that could have been taken to avoid the drafting of the Motions. Certainly the City has not shown any "rare and exceptional circumstances" that justify a lodestar adjustment as is its burden. *Camacho*, 523 F.3d at 980. Nor could it. It was the City's continued and persistent lack of response to Mr. Roberts' repeated efforts to resolve this matter *without* incurring the hours that caused the hours to be incurred. It was completely reasonable to expend hours drafting the documents when the City flatly and repeatedly refuses to respond in the face of an ongoing constitutional violation, particularly where, as here, the City had notice that the documents would be drafted. Plaintiffs should not be required to indefinitely suffer injustice and/or until some arbitrary time when the City finally decides to respond. <u>These hours are not reasonably avoidable because the case cannot progress if Plaintiffs are required to wait indefinitely for a Defendant's response</u>.

While the City is correct that Plaintiffs should not accrue unreasonable fees, Mr. Roberts could have simply filed the Motion for Preliminary Injunction contemporaneously with the Complaint and the Motion for Judgment on the Pleadings immediately after the filing of the Answer. Such would have resolved the issue of whether he should be compensated for "unfiled" motions. Instead, Mr. Roberts continually sought to avoid those hours by attempting to resolve this matter without resorting to the motions. The City (seemingly purposely, considering the

timing of its letter sent at 12:16 a.m. on December 28, 2015) never timely responded throughout this litigation. Counsel did not even receive a phone call or e-mail stating that the City needed more time to resolve these issues.

<u>Counsel should be rewarded and not punished for the efforts to settle without incurring additional fees.  The City should not be permitted to wait until it knows that work will be completed before taking necessary action and then later complain that the hours were expended.</u>  Acceptance of the City's argument would reward such delay tactics and create an environment where Plaintiffs would be hesitant to perform the work necessary to prosecute their claims.  This directly contravenes the express purpose of 42 U.S.C. § 1988. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) ("'If private citizens are to be able to assert their civil rights, and if those who violate the Nation['s] fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.'") (*quoting* S.Rep. No. 94–1011, at 2 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5910).

The City's argument should be rejected.  [Doc. 21, pp. 10-13]

### **Mr. Beck's alleged block-billing.**

The City contends that Mr. Beck block-billed 42.5 in regards to the drafting of the Motion for Preliminary Injunction and 29.8 hours in regards to the drafting of the Attorneys' Fees Motions and requests a reduction of 8.5 and 5.9 hours,

9

respectively, because of this purported block-billing. [Doc. 21, pp. 13-14, 15] The City's own definition of block-billing is where attorneys "do not itemize the time expended on specific tasks, but rather enter total daily time spent working on a case." [Doc. 21, p. 13] Yet, Mr. Beck's entries are not merely a recitation of time spent on a given day working on a case. Instead, Mr. Beck specifically identifies the task performed on the date. *See Robinson v. City of Edmond*, 160 F.3d 1275, 1284 n.9 (10th Cir. 1998). The City does not even allege that the entries contain unreasonable work (other than to argue that the work should not have been compensated at all) and has not presented any "rare and exceptional circumstance" that justifies a deviation from the lodestar. *Camacho*, 523 F.3d at 980.

Even if this Court finds that some entries were "block-billed,"[5] the requested 20% across-the-board "meat axe" reduction for those entries is excessive (and is not even supported by the City's cited case). Because Mr. Beck specifically noted exactly what task he was engaged in and engaged in small tasks for which he did not bill, a 5% reduction would be more appropriate should this Court find the entries were "block billed."

---

[5] Even if this Court does reduce some entries for "block-billing", this Court should not reduce: the 2.2 hours spent researching immigration law on November 22, 2015; the 1.3 hours spend drafting the PI Motion on November 14, 2015; the 1.2 hours spent drafting the PI Motion on November 15, 2015; the 4.0 hours spent on January 3, 2016 which are itemized by task, or the 3.5 hours spent on January 8, 2016 drafting the "Kerr factors prong of attorneys' fees motion." Those entries are specific as to what work occurred in those short amounts of time.

10

**<u>The time spent drafting the Motion for Attorneys' Fees should not be reduced.</u>**

The City simply concludes without any explanation whatsoever, that "the amount both Holcomb and Beck billed for the Motion are facially excessive and unreasonable." [Doc. 21, p. 15]  <u>The City does not attempt to even cite one entry that contains any excessive billing whatsoever</u>.  The City has not met its burden.  *Camacho*, 523 F.3d at 980.  And, while some of the argument and exhibits may have already been submitted in the Motion for Attorneys' Fees in *Hawaii Defense Found.*, **Exh. "A"**, that does not result in a reduction of the hours spent *even where the work is duplicated in the same case*:

> When a case goes on for many years, a lot of legal work product will grow stale; a competent lawyer won't rely entirely on last year's, or even last month's, research: Cases are decided; statutes are enacted; regulations are promulgated and amended. A lawyer also needs to get up to speed with the research previously performed. All this is duplication, of course, but it's *necessary* duplication; it is inherent in the process of litigating over time. Here, there was a previous appeal (of the district court's grant of summary judgment) which would have added to the delay and rendered much of the research stale. One certainly expects *some* degree of duplication as an inherent part of the process. There is no reason why the lawyer should perform this necessary work for free.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).  The hours expended here were necessary and the City does not even attempt to identify a single unnecessary duplicative hour.  "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on

11

the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

## The requested rate should be awarded.

As the City acknowledges, the fee awarded "should reflect the prevailing market rates in the community". *Webb v. Ada County*, 285 F.3d 829, 840 n.6 (9th Cir. 2002). "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) *opinion amended on denial of reh'g*, 808 F.2d 1373 (9th Cir. 1987) (citation omitted). Here, Plaintiff has submitted a total of four declarations from lawyers practicing in Honolulu. [Docs. 12-2, 12-3, 12-4, 18] Each of those lawyers commands, in this market, a higher rate than that awarded to the instant lawyers in every single case for at least five years. *Id*. Indeed, a lawyer with half the experience of Mr. Holcomb commands *in this market* $3 per hour less than that requested by Mr. Holcomb. [Doc. 18] A bottom-tier lawyer fresh out of law school is compensated by the City at $5 per hour less than that requested by Attorney Holcomb and $70 per hour more than that requested by Mr. Beck. [Doc. 12-23]

The City's sole response to this evidence is that "none of the declarations attest that the hourly rate charged to clients" has been awarded to those attorneys

12

and that Plaintiff has provided "no evidence that the Court has found the hourly rate requested by Plaintiffs to be reasonable given the experience, skill and reputation of Plaintiff's counsel." [Doc. 21, p. 16]   The City ignores the entire basis of Plaintiff's arguments (and all other Plaintiffs represented by the undersigned who have applied for attorneys' fees), supported by numerous citations and exhibits, *i.e.*, that the rates imposed do not reflect the true prevailing market rate for similar attorneys.  The Ninth Circuit has specifically addressed this argument:

> District judges can certainly consider the fees awarded by other judges in the same locality in similar cases. But adopting a court-wide policy—even an informal one—of "holding the line" on fees at a certain level goes well beyond the discretion of the district court. One problem with any such policy is that it becomes difficult to revise over time, as economic conditions change; here the rate apparently hadn't changed for 10 years, and even a $50 increase in the hourly rate was considered a "big step ... for the court generally." Unless carefully administered and updated, any such policy becomes a strait-jacket. More fundamentally, such a policy—no matter how well intentioned or administered—is inconsistent with the methodology for awarding fees that the Supreme Court and our court has adopted. The district court's function is to award fees that reflect economic conditions in the district; it is not to "hold the line" at a particular rate, or to resist a rate because it would be a "big step." If the lodestar leads to an hourly rate that is higher than past practice, the court must award that rate without regard to any contrary practice.

*Moreno*, 534 F.3d 1106, 1115 (9th Cir. 2008).  Remarkably, the City argues for imposition of the foreseen strait-jacket, insisting that this Court award Plaintiff no more than has been awarded for work done almost five years ago despite a continued

13

accrual of skill and experience as well as inflation.[6] [Doc. 21, pp. 4, 17] Counsel should not be forever locked at this rate which was too low four years ago.

The entire congressional purpose of fee awards under § 1988 is to *encourage* lawyers to represent clients whose rights have been violated by ensuring they are paid just as they would if they represented clients who paid an hourly rate:

> Congress made clear that it "intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and *not be reduced because the rights involved may be nonpecuniary in nature.*" Senate Report, at 6, U.S.Code Cong. & Admin.News 1976, p. 5913 (emphasis added). "[C]ounsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, '*for all time reasonably expended on a matter.* ' " *Ibid.* (quoting \*576 *Van Davis v. County of Los Angeles,* 8 EPD ¶ 9444 (CD Cal.1974) (emphasis added)).

*City of Riverside v. Rivera*, 477 U.S. 561, 575-76 (1986). Consistently awarding lawyers more than one third less than they could demand from clients who would pay their hourly rate, particularly where no raise is afforded for years, defeats this purpose. Instead, lawyers are rightfully encouraged to accept non-indigent clients who will pay the lawyers' hourly rate, leaving indigent clients with little or no damages unrepresented. This Court should award the requested rates which are reasonable and reflect the prevailing market rate in Honolulu.

---

[6] Counsel notes that none of the "missteps" relied upon, in part, in rejecting Mr. Holcomb's requested hourly rate of $355 in *De-Occupy Honoluolu, et. al. v. City and County of Honolulu, et. al.*, Civ. No. 12-00668 JMS-KSC are remotely present in this case. [*See* Doc. 21-4, pp. 25-26]

14

## **CONCLUSION**

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Although the City has made a number of conclusory allegations, it has not met its burden to show that the hourly rate and hours expended are unreasonable or otherwise justify a "rare and exceptional" departure from the requested lodestar amount. This Court should grant the motion without any reductions.

Further, Plaintiff requests that this Court award Mr. Holcomb an additional $2760 for the 9.2 hours expended on this Reply plus the GET tax of $130.05. *See* Holcomb Decl., **Exh. B**. Plaintiff requests that this Court award Mr. Beck an additional $3307.50 for the 14.7 hours expended on this Reply plus the GET tax of $155.85. Beck Decl., **Exh. C**.

DATED: Honolulu, Hawaii; February 26, 2016.

*s/Richard L. Holcomb*
Richard L. Holcomb 9177
